UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Lisimba Patilla,                                                    Case No. 3:20-cv-87

          Plaintiff,

       v.                                                    MEMORANDUM OPINION
                                                                AND ORDER

Freudenberg-NOK General
Partnership,

          Defendant.


## I.     INTRODUCTION

On January 15, 2020, Plaintiff Lisimba Patilla filed a complaint against his former employer Defendant Freudenberg-NOK General Partnership alleging race discrimination and retaliation under both federal and state law. (Doc. No. 1). On November 19, 2022, Defendant filed a motion for summary judgment as to all of Patilla's claims. (Doc. No. 17). Patilla opposed the motion, (Doc. No. 18), and Defendant replied. (Doc. No. 19). For the reasons stated below, I grant Defendant's motion for summary judgment.

## II.     BACKGROUND[1]

Patilla, an African-American male, began working at Freudenberg in January 2018 as a Sales Manager. (Doc. Nos. 1 at 2 & 17-1). As a Sales Manager, Patilla sold after-market auto parts to business customers. (Doc. No. 17-2 at 127). Defendant's headquarters are in Milan, Ohio, but Patilla worked remotely from his home. (*Id.* at 125). Patilla reported to Commercial Manager Mark

---

[1] All page citations are to the PageID#.

Pascuzzo, a Caucasian male. (Doc. Nos. 1 at 3 & 17-1). Pascuzzo was also a remote employee. (Doc. No. 17-3 at 150). Pascuzzo reported to Director of Sales Corrine Ross. (*Id.*).

Patilla testified he was the only African American at the Milan office and when Ross introduced him to the CEO she stated, "I got you one." (Doc. No. 18-14 at 524-25). Patilla originally interpreted this to mean an aggressive salesperson but later believed the comment was in relation to his race. Patilla testified he was being stereotyped by his co-workers. (*Id.* at 518).

A. **DEFENDANT'S CONCERNS REGARDING PATILLA**

During Patilla's first week of work, Marketing Manager Mallory Long reported Patilla to Human Resources Manager Frank Valassiades for making inappropriate sexual comments at lunch. (Doc. No. 17-12 at 245-46). Patilla reportedly "talked about being a lady's man" and "went into detail about his penis, called it an anaconda, and mentioned that his wife was pleased with it." (*Id.* at 246). Patilla also allegedly stated, "I can see I am making you uncomfortable. You'll get used to it." (*Id.* at 247). Long agreed to keep working with Patilla since he was a new employee but called the incident a "red flag." (*Id.*).

On January 15, 2018, Pascuzzo sent Patilla a meeting invitation for a "Weekly 1-on-1" meeting where Patilla could "touch base" with his supervisor and address any concerns. (Doc. No. 17-5 at 166-67). Pascuzzo requested that if the meeting time did not work for Patilla due to other commitments that he attempt to reschedule the meeting. (*Id.* at 167). Patilla missed the first meeting on February 14, 2018, without notice. (*Id.* at 166). Pascuzzo emailed Patilla explaining, "[i]n the future when you have a conflict with our 1 on 1 please request to have it scheduled to another time or date and somewhat in advance. I schedule my days around these calls and take them very seriously so I can support you." Patilla responded stating that he "consider[ed] the 1 on 1 redundant[.]" (*Id.* at 165). Pascuzzo replied explaining how the 1 on 1 meetings were an essential

2

component of the company's reporting structure and stressing the importance of these meetings to stay informed. (*Id.*). Patilla responded that he understood. (*Id.*).

Shortly thereafter, in an email to Pascuzzo regarding company sales, Patilla wrote "your team approach is VOID and I am the new plan and the Sales Manager position is no longer a GROUP responsibility." (Doc. No. 17-13) (capitalizations in original).

On March 6, 2018, Pascuzzo and Ross met with Patilla to discuss concerns regarding Patilla's communication style and his failure to conform to company principles. (Doc. No. 17-15). Among other things, Pascuzzo and Ross discussed attendance at 1 on 1 meetings, building relationships, and supporting the company's sales strategies. (*Id.*). Specifically, they counseled that while Patilla thought his communications were "direct and transparent" it may translate as "rude and alienating." (*Id.*). Pascuzzo commented "it is unclear if he understands that his [communication] is out of line with what is acceptable communication at Freudenberg." (*Id.*). Patilla later testified he did not agree that his communications were rude. (Doc. No. 17-2 at 130-31).

In May 2018, Patilla missed a scheduled 1 on 1 meeting without notice. (Doc. No. 17-6 at 170). Upon inquiry from Pascuzzo, Patilla responded that he had "Nothing to share." (*Id.* at 169). Pascuzzo replied, reminding Patilla of the 1 on 1 meeting's importance, particularly for remote employees, and that Patilla could always propose a different time for the meeting if there was conflict. (*Id.*).

Patilla had a meeting with Pascuzzo and Valassiades on May 16, 2018, to discuss the same concerns addressed in the March meeting. (Doc. No. 17-2 at 132-34). Patilla testified that he was threatened with termination at both the March and May meetings. (*Id.* at 133).

In June 2018, Patilla refused to accept an invite from Pascuzzo to attend a team meeting until Pascuzzo "let [Patilla] know *why* we are meeting." (Doc. No. 17-7 at 177-78) (emphasis in original delineated by quotations). Patilla continued, "Otherwise I consider you want to meet to

discuss sabotaging what I have created." (*Id.* at 177). Pascuzzo explained that the reason for the meeting was in the original invitation, that Patilla was expected to attend meetings scheduled by his supervisor, and that unless he proposed a new time for the meeting, Pascuzzo would expect him to attend. (*Id.*). Patilla did not attend the meeting.

That same month, in response to Pascuzzo, Patilla wrote, "I am not driving to Milan for the report out meeting to build relationships, relationships are a two-way function . . . my relationships are fine with people I work with on a daily basis." (Doc. No. 17-7 at 199). Pascuzzo forwarded this email chain to Valassiades, further commenting, "I can't coach or manage someone that is not coachable or manageable. I tried to help him out . . . This guy is looking for a fight[;] won't take guidance or direction . . . ." (*Id.*).

On July 9, 2018, Patilla missed the monthly sales team call without notice. (Doc. No. 17-8). Patilla also declined to meet with Pascuzzo for the 1 on 1 meeting that week. (*Id.*).

Patilla then failed to attend another team meeting without notice or explanation on August 15, 2018. (Doc. No. 17-10 at 235). Patilla was also 25 minutes late to a scheduled sales meeting later that month without notice or explanation, effectively missing the entire meeting. (Doc. No. 17-9).

During this same time, Patilla was informed by Pascuzzo that he would not be attending a sales conference in Germany due to budget restrictions. (Doc. No. 17-14 at 259). When Patilla questioned the decision, Pascuzzo told him to put together a business case as to why he should attend, and Pascuzzo would present it to Ross. (*Id.* at 258-60). Patilla interpreted this as discrimination and questioned whether Pascuzzo or the other employee going had to present a business case. (*Id.*). In a separate incident, Patilla argued with Pascuzzo over email questioning Pascuzzo's directives and advice and stated, "Make up your mind . . . ." (Doc. No. 17-7 at 181-192).

Pascuzzo forwarded the email chain to Valassiades noting Patilla, "Takes no feedback positive or negative. Receives no coaching with an open mind." (Doc. No. 17-7 at 207).

Pascuzzo reported further issues with Patilla's work performance in September 2018 to Valassiades. (Doc. No. 17-10). In his summary, Pascuzzo reported, among other things, Patilla had not arranged meetings with potential customers, failed to follow up on leads, and failed to provide requested information to customers. (*Id.* at 234). Pascuzzo wrote "this [is] an extremely bad miss for a salesperson and I attribute it to [Patilla's] bad attitude and frankly his lack of performing the basics of his job." (*Id.*). At this time, Pascuzzo expressed a desire to terminate Patilla and stated, "I would like to work with you and Legal to do this in a manner that makes the most sense for us and causes the least amount of exposure but it is time to make a change." (*Id.* at 235).

On October 26, 2018, Patilla was issued a written warning by Pascuzzo and Valassiades. (Doc. No. 17-16). The warning outlines numerous areas for improvement, including regular attendance at meetings, complying with managerial directives, and communicating with respect. (*Id.*). The warning also included notice that the failure to improve may result in termination. Patilla later testified that he did not believe the criticisms noted in this written warning, or those previously expressed to him at the prior meetings in March and May, because it was "more [ ] stuff people made up that they were trying to make out to be me." (Doc. No. 17-2 at 141).

On November 5, 2018, Patilla received a pricing inquiry from one of his customers and he forwarded the information to Pascuzzo and another team member via email requesting help to resolve the issue. (Doc. No. 17-11 at 238). A group call was immediately set up to discuss the issue, but Patilla failed to attend. (*Id.* at 242). In reporting this failure to Valassiades, Pascuzzo noted, "If he was engaged and working[,] he wouldn't have missed this [meeting]. Time to cut ties." (*Id.* at 238).

5

Pascuzzo testified that following the October written warning, "nothing changed immediately as it had not changed the entire time [ ] [Patilla] had been there." (Doc. No. 17-3 at 157). Defendant issued Patilla a Notice of Termination on November 13, 2018. (Doc. No. 17-19). Pascuzzo testified the decision to terminate was based on "an accumulation of the same things over and over again," not a specific incident. (Doc. No. 17-3 at 157). He further stated that the EEOC charge filed in May of 2018 had nothing to do with his termination but instead, it was his "frustrations [ ] around the business and getting the job done." (*Id.* at 156).

### B. PATILLA'S COMPLAINTS OF RACE DISCRIMINATION

On May 26, 2018, Patilla filed a charge with the EEOC alleging race discrimination by Defendant, and specifically, that Pascuzzo was treating him differently and was creating a hostile work environment. (Doc. No. 17-17 at 291). Defendant was notified of the charge a few days later. (*Id.* at 280). Following the submission of documents by both parties, the EEOC dismissed the charge in October 2019, stating, "The evidence of record reveals that counseling was provided on March 6, 2018, and May 16, 2018, regarding aggressive and demanding interactions with co-workers. Additionally, the evidence failed to reveal that you were subject to unequal terms and conditions of employment." (*Id.* at 286). Patilla was issued a "right to sue" notice on October 30, 2019. (*Id.* at 283).

While his EEOC charge was pending, Patilla also made an internal complaint of race discrimination to Defendant's human resources department on July 10, 2018. (Doc. No. 17-7 at 216). Due to Patilla's complaint that so many people in Milan were involved, Defendant assigned an HR representative from another facility to perform the investigation. (*Id.* at 218). In a July 30, 2018 letter Defendant stated it had failed to discover any violations of company policy. Defendant further explained:

> While you may have had some difficult interactions with your peers and managers in the seven months since your hire, it is our view that each of those interactions was

6

> based on work-related concerns regarding things such as your communication style, behaviors, and lack of participation in meetings and those issues were addressed in an even-handed and respectful fashion.

(*Id.*).

Patilla made another complaint to HR in late August 2018, alleging race discrimination because he was not going to the sales conference in Germany and because Pascuzzo had requested that he make a business case for why he feels he should attend, claiming it was discriminatory that Pascuzzo did not have to make a business case to Ross to attend. (*Id.* at 223-24). After investigation, two representatives from HR held a meeting with Patilla to address this complaint and inform him that the decision not to send him to Germany was for legitimate reasons. (*Id.* at 221-22). Patilla emailed later asking if the HR representatives had reviewed the budget to confirm whether money was available to send Patilla to Germany. (*Id.* at 221). When HR responded that it had performed an investigation and reviewed all relevant information, but declined to share further details, Patilla accused HR of hiding things. (*Id.* at 220). It was confirmed during the deposition of one of the HR representatives, Nancy Vansolkema, that the budget was not reviewed during the investigation. (Doc. No. 18-18 at 651).

### III.   STANDARD

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the

7

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* Fed. R. Civ. P. 56(e)). It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### IV. ANALYSIS

Patilla asserts his claims for relief based on indirect evidence. (*See* Doc. No. 18 at 449-55). Thus, I will analyze his claims under the *McDonnell Douglas* burden-shifting framework. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). Under *McDonnell Douglas*, the plaintiff first must establish a prima facie case. *Id.* If the plaintiff can do so, the burden shifts to the defendant to put forth a legitimate, non-discriminatory reason for its decision. *Id.* If the defendant provides such a reason, then the plaintiff must demonstrate the proffered reason was pretext. *Id.*

#### A. PRIMA FACIE CASE OF RACE DISCRIMINATION (COUNTS 1 & 3)

Patilla asserts claims for race discrimination under both federal and state law. (*See* Doc. No. 1). Courts in the Sixth Circuit analyze state law claims for discrimination under the same standard as federal claims. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *see also Plumbers &*

8

*Steamfitters Joint Apprenticeship Comm'n v. Ohio Civil Rights Comm'n*, 421 N.E. 2d 128, 131 (Ohio 1981) (applying Title VII case law to violations of Ohio's discrimination statute).

A prima facie case of race discrimination requires a plaintiff to show he: (1) is a member of protected class; (2) was qualified for the position; (3) was discharged; and (4) was replaced by a person outside the protected class or was treated less favorably than a similarly situated person outside of his protected class. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). The dispute in this case revolves around the fourth factor.

"A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Grosjean v. First Energy Corp.,* 349 F.3d 332, 336 (6th Cir. 2003) (internal quotation and citation omitted). "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.*

Defendant argues Patilla was not replaced but instead, his job responsibilities were redistributed to Joe Pulizari, a Caucasian co-worker. (Doc. No. 17 at 108-09). At the time he took over Patilla's accounts, Pulizari was employed by Defendant to service accounts related to its TransTec business. (*See* Doc. No. 17-20 at 429; *see also* Doc. No. 18-15 at 589). For about six months after Patilla's termination, Pulizari spent half his time completing his outstanding TransTec projects and half his time covering the Corteco business that had previously belonged to Patilla. (Doc. No. 17-20 at 429-30). Pulizari continues to cover the Corteco business accounts. (*Id.* at 430).

Upon review, I conclude there is sufficient evidence to infer Patilla was replaced. This is because Pulizari stated he only performed both jobs for approximately six months. (*Id.* at 429-430). Although Pulizari stated he currently covers Patilla's former Corteco business, there is no assertion that he is still servicing the TransTec accounts. (*Id.*). Viewing the evidence in the light most favorable to Patilla, Pulizari transitioned into only servicing the Corteco account, which is a

9

reassignment of duties rather than a redistribution. *See Jones v. Shinseki*, 804 F. Supp. 2d 665, 673 (M.D. Tenn. 2011) ("In this case, while Moss took on Plaintiff's duties in addition to his own duties *for a time*, he 'replaced' Plaintiff because he was eventually reassigned to Plaintiff's position.") (emphasis added); *see also id.* (finding plaintiff made prima facie case where co-worker performed both jobs for a year, but then formally assumed plaintiff's position).

Furthermore, Pulizari described his former position as Application Engineer responsible for product lifestyle management, building new products, and assisting the commercial team. (Doc. No. 17-20 at 429). But Patilla's position was Sales Manager responsible for selling parts to over 100 customers. (Doc. No. 17-1). These positions do not appear to be equivalent and raise the question of whether Defendant "had to fundamentally change the nature of [Pulizari's] employment" to cover Patilla's job responsibilities. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997); *see also Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530 (6th Cir. 2014) (finding sufficient evidence at prima facie stage for replacement where employee's new job duties almost completely subsumed his former responsibilities). Accordingly, I find sufficient evidence to support Patilla's prima facie case of discrimination.

### B. PRIMA FACIE CASE OF RETALIATION (COUNTS 2 & 4)

Patilla asserts a claim of retaliation under both federal and state law. "Because of these statutes' similar language and origin, Ohio courts have held that 'federal law provides the applicable analysis for reviewing retaliation claims' brought under Ohio Rev. Code § 4112.02(I)." *Braun v. Ultimate Jetcharters, LLC,* 828 F.3d 501, 510 (6th Cir. 2016) (quoting *Baker v. Buschman Co.*, 713 N.E. 2d 487, 491 (Ohio Ct. App. 1998)).

Establishing a prima facie case requires the plaintiff to show: (1) he engaged in a protected activity; (2) the protected activity was known to defendant; (3) defendant took adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse

employment action. *Id.* Defendant only challenges the existence of the fourth element – causal connection. (Doc. No. 17 at 114).

At the prima facie stage, temporal proximity alone may satisfy the causal element. *Montell v. Diversified Clinical Servs., Inc.,* 757 F.3d 497, 505 (6th Cir. 2014) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity alone may satisfy the causal prong of a plaintiff's prima facie retaliation case.") (internal quotation marks omitted). Patilla made his first complaint to the EEOC on May 26, 2018, and thereafter made internal complaints to HR on July 10, 2018, and on August 27, 2018, and had a meeting with HR on September 6, 2018, regarding his complaints of race discrimination. Patilla received a written warning on October 26, 2018, and was terminated on November 13, 2018. (Doc. Nos. 17-16 & 17-19).

Taking the evidence in a light most favorable to Patilla, the six-month period between when he first complained to the EEOC and his termination is sufficiently close temporal proximity to establish a prima facie case of retaliation, particularly where there are other instances of protected activity within that period. *See Nicholson v. City of Clarksville, Tenn.*, 530 F. App'x 434, 447 (6th Cir. 2007) (stating a prima facie case based on temporal proximity alone requires a short period of time, "usually less than six months.") (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000); *Sharp v. Aker Plant Servs. Grp., Inc.,* 600 F. App'x 337, 341 (finding district court erred by concluding a six-month period between protected activity and adverse action categorically precludes causation). Accordingly, I find sufficient evidence to support Patilla's prima facie case of retaliation.

## C. MCDONNELL DOUGLAS BURDEN SHIFTING

Patilla has met his burden to establish a prima facie case for both race discrimination and retaliation. The argument and evidence in support of the remaining *McDonnell Douglas* analysis applies equally to both claims.

11

### 1. Legitimate, non-discriminatory reason for termination

There is ample evidence in this case to establish Defendant's legitimate, non-discriminatory reason for terminating Patilla. For example, Patilla repeatedly missed meetings with his supervisor without notice. (*See* Doc. Nos. 17-5, 17-6, 17-7 at 176-78, 17-8, 17-9, & 17-11). Patilla also continually failed to meet Pascuzzo's expectations for the position or questioned his directives. (*Id.*; *see also* Doc. Nos. 17-10, 17-13, & 17-14). (*See, e.g.*, Doc. No. 17-5 (when asked why he did not attend a meeting with Pascuzzo, Patilla stated "I consider the 1 on 1 meeting redundant"); Doc. No. 17-6 (when asked by Pascuzzo why he had not accepted a team meeting invite, Patilla responded "let me know *why* we are meeting") (emphasis in original delineated by quotation marks); Doc. No. 17-13 at 251 (when asked by Pascuzzo whether Patilla wanted any topics covered at a meeting with his customer, Patilla stated, "I did not know you were preparing for a meeting with them, so talk to them about whatever you are talking to other customers about"); *id.* at 249 (in response to Pascuzzo, Patilla stated "your team approach is VOID and I am the new plan") (capitalization in original)).

Defendant twice verbally warned Patilla that his actions, and particularly his communication style, did not meet with the company's standards and threatened to terminate him if he did not improve. (*See* Doc. Nos. 17-2 at 132-33 & 17-15). A written warning issued October 26, 2018, outlined several areas that required improvement including responding to customer requests, attending internal and external meetings, and "immediate and sustained improvement in your communications with your manager and co-workers." (Doc. No. 17-16). This written warning concluded with notice that failure to improve may result in termination. (*Id.*). Patilla's behavior and performance did not improve, (Doc. No. 17-3 at 157), and he was terminated on November 13, 2018. (Doc. No. 17-19).

12

Defendant's citation to record evidence establishing Patilla's performance and attitude issues over the course of his employment adequately presents a legitimate, non-discriminatory reason for terminating Patilla. As such, the burden shifts back to Patilla to prove pretext.

**2. Pretext**

"A plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's actions, or (3) that they were insufficient to motivate the employer's actions." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted). At this stage, "the question is not whether the employer's reason for a decision [is] right but whether the employer's description of its reasons is honest." *Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508, 514 (6th Cir. 2012). To carry his burden on summary judgment, "[Patilla] must produce sufficient evidence from which a jury could reasonably reject [Defendant's] explanation of why it fired [him]." *Chen,* 580 F.3d at 400.

In support of pretext, Patilla argues he was only disciplined after complaining of discrimination to the EEOC on May 26, 2018. (Doc. No. 18 at 456). But this characterization is unsupported by the facts. Patilla received verbal warnings in March and May 2018. (Doc. Nos. 17-15 & 17-2 at 132-34). The basis for those verbal warnings was well-documented. (*See e.g.*, Doc. No. 17-5 (missed February 1 on 1 meeting with Pascuzzo without notice; Patilla stated the meeting was redundant); Doc. No. 17-6 (missed May 1 on 1 meeting with Pascuzzo without notice); Doc. No. 17-13 at 249 (Patilla to Pascuzzo in February 2018, "your team approach is VOID and I am the new plan") (capitalization in original)). Patilla confirmed that at both meetings he was threatened with termination. (Doc. No. 17-2 at 133).

But even accepting Patilla's characterization of his disciplinary history as not beginning until the October written warning, "[u]nlike its role in establishing a prima facie case, the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Amos v. McNairy*

13

*Cnty.,* 622 F. App'x 529, 538 (6th Cir. 2015) (citing *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 285 (6th Cir. 2012)). And furthermore, "evidence that an employer 'proceed[ed] along lines previously contemplated, though not yet definitively determined,' in taking its adverse employment action 'is no evidence whatever of causality.'" *McKinnon v. L-3 Commc'ns Corp.,* 814 F. App'x 35, 45 (6th Cir. 2020) (quoting *Montell*, 757 F.3d at 507).

Here, the record shows Defendant's issues with Patilla pre-existed his protected activity and continued unabated afterwards. Patilla was given an opportunity to correct those issues, but the record demonstrates he did not. (*See, e.g.*, Doc. No. 17-7 at 176-78 (Patilla refused to attend June team meeting until Pascuzzo explained to him "*why* we are meeting") (emphasis in original delineated by quotation marks)); Doc. No. 17-8 (Patilla missed July monthly sales call without notice and declined to attend 1 on 1 meeting with Pascuzzo); & Doc. No. 17-9 (Patilla arrived 25 minutes late to August team meeting without notice)).

Pascuzzo reported these persistent and ongoing issues to Valassiades. (*See* Doc. No. 17-7 at 199) (June 14, 2018, Pascuzzo stated Patilla "won't take guidance or direction[,]" and that he "can't coach or manage someone that is not coachable or manageable."); *id.* at 207 (August 28, 2018, Pascuzzo wrote that Patilla "[t]akes no feedback positive or negative. Receives no coaching with an open mind."); & Doc. No. 17-10 (discussing performance issues on September 26, 2018, "[w]e are looking at this as an extremely bad miss for a salesperson and I attribute it to his bad attitude and frankly his lack of performing the basics of his job.")).

When Patilla was given a written warning on October 26, 2018, it was for similar behavior that had precipitated his verbal warnings. (*Compare* Doc. Nos. 17-15 & 17-16). For example, the written warning required improvements in attending internal meetings, complying with directions from Pascuzzo, and communicating with respect. (Doc. No. 17-16). The written warning included notice that failure to correct his behavior may result in termination. (*Id.*).

While all of this occurred simultaneously with Patilla's protected activity, the evidence establishing a pre-existing, well-documented, and uncorrected disciplinary issue is sufficient to cut against any inference of pretext created by temporal proximity. *See Sturdivant v. Westin Hotel Mgmt.*, No. 12-10148, 2013 WL 951031 at * 8 (E.D. Mich. March 12, 2013) (noting that any inference created by temporal proximity was undermined by Defendant issuing previous discipline for the same conduct). This inference is further diluted because the bases for Patilla's prior disciplines were ultimately the same reasons for Patilla's termination. (Doc. No. 17-3 at 157); *see also McKinnon,* 814 F. App'x at 45 (evidence of causality is weakened where employer proceeds with a course of action previously contemplated).

Patilla also cites to Pascuzzo's statement to Valassiades in September 2018 where Pascuzzo, after reporting more performance issues with Patilla, stated: "It is my intention to sever ties with Lisimba Patilla. I would like to work with you and Legal to do this in a manner that makes the most sense for us and causes the least amount of exposure[.]" (Doc. No. 17-10 at 235). But when taken in context of the record, this statement provides no more evidence of pretext than it does of a legitimate discipline process.

Patilla next argues Valassiades' reliance on Pascuzzo's reports of Patilla's actions to make the decision to terminate him is evidence of pretext. (Doc. No. 18 at 457).[2] I fail to see how this fact, even if taken as true, creates an inference of pretext. *See Chen*, 580 F.3d at 401 ("Absent a reason to doubt the validity of these reports, [employer] was entitled to rely on this information in deciding to

---

[2] Patilla also argues "as Ross plainly put it, they were simply 'looking across the information to see what we could find' to terminate Patilla's employment." (Doc. No. 18 at 457) (citing Doc. No. 18-16 at 599). While the quotation from Ross's deposition is correct, the context from which this quote is lifted is unknown and there is no evidence that Ross made this comment in relation to Patilla's termination. Patilla only submitted excerpts of the deposition and the surrounding context for this quote is not sufficiently represented. Thus, this citation does little to support Patilla's claim of pretext and will not be discussed further. *See* Fed. R. Civ. P. 56(c)(1) (requiring citation to "particular parts of materials in the record" to support argument).

15

terminate [employee] and acted reasonably in doing so."). This argument appears to be an attack on the merits of Defendant's decision to fire him. But an employer is entitled to summary judgment on pretext if it "honestly relies on particularized facts in making an employment decision" even if that decision is later shown to be "mistaken, foolish, trivial, or baseless." *Id.*

Those particularized facts exist in abundance here. The record shows Patilla's issues began immediately. In his first week of work, Long reported Patilla to HR for discussing his penis at lunch. (Doc. No. 17-12 at 246-47). Patilla's performance and attitude issues over the following months are well-documented. (*See, e.g.*, Doc. No. 17-5 (missed February 1 on 1 meeting with Pascuzzo without notice, Patilla stated the meeting was redundant); Doc. No. 17-13 at 249 (Patilla to Pascuzzo in February, "your team approach is VOID and I am the new plan") (capitalization in original); Doc. No. 17-6 (missed May 1 on 1 meeting with Pascuzzo without notice); Doc. No. 17-7 at 176-78 (Patilla refused to attend June team meeting until Pascuzzo explained to him "*why* we are meeting") (emphasis in original delineated by quotation marks)); *id.* at 199 (Patilla to Pascuzzo in June 2018 "I am not driving out to Milan for the report out meeting to build relationships, relationships are a two-way function . . . my relationships are fine with the people I work with on a daily basis."); Doc. No. 17-8 (Patilla missed July monthly sales call without notice and declined to attend 1 on 1 meeting with Pascuzzo); Doc. No. 17-9 (Patilla arrived 25 minutes late to August team meeting without notice); Doc. No. 17-13 at 251 (when asked by Pascuzzo whether Patilla wanted any topics covered at a meeting with his customer, Patilla stated, "I did not know you were preparing for a meeting with them, so talk to them about whatever you are talking to other customers about"); & Doc. No. 17-11 (Patilla missed November meeting regarding pricing issues for one of his customers without notice)).

Patilla disagrees that his communication style was improper or could serve as a basis for discipline. For example, in response to the March 2018 verbal warning where Defendant "discussed

16

that direct and transparent [communication] should not translate to rude and alienating[,]" (Doc. No. 17-15), Patilla testified, "that was them talking to me creating this illusion in their minds that somehow my intellect somehow negatively affected people." (Doc. No. 17-2 at 131). Patilla felt similarly about the October 2018 written warning. (*Id.* at 141) (stating it was "more [ ] stuff people made up that they were trying to make out to be me.").

But Patilla's subjective belief that Defendant's criticisms of his performance and attitude were unfounded is not evidence of discrimination. *Mitchell*, 964 F.2d at 585 (stating "conclusory allegations and subjective beliefs [ ] are wholly insufficient evidence to establish a claim of discrimination as a matter of law."). "Though [Patilla] plainly believes racial discrimination is rampant at [Freudenberg], his interpretation of the conduct of, or decisions made by, certain administrators does not create a genuine dispute of material fact as to whether . . . his termination [was] motivated by his race." *McBryde v. A Renewed Mind*, No. 3:15-cv-2498, 2019 WL 4110454, at *8 (N.D. Ohio Aug. 29, 2019).

Here, his performance and attitude issues were well-documented throughout his employment. Those same issues, about which he was warned multiple times, served as the basis for his termination. (*See* Doc. Nos. 17-2 at 133-34; 17-3 at 157; 17-15; & 17-16). Similar conduct has been found to be a legitimate basis for adverse employment actions. *See, e.g., Franks v. Vill. of Bolivar*, 583 F. App'x 534, 538 (6th Cir. 2014) ("[Plaintiff] was repeatedly insubordinate and unprofessional with [his supervisor] and others. These are legitimate non-discriminatory reasons for terminating [plaintiff]."); *Segel v. Kimberly-Clark Corp.*, 473 F. App'x 416 (6th Cir. 2012) (employee's objectively good sales numbers did not transform discipline for failing to correct long and well-documented issues with interpersonal behavior into pretext); *Viergutz v. Lucent Tech., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) ("[T]he inability to get along with co-workers is a sufficient basis to take adverse

employment action."); *Chen*, 580 F.3d at 401-02 (finding no pretext where plaintiff had long, documented history of performance and interpersonal issues).

Aside from Patilla's subjective belief that there were no issues with his workplace conduct, Patilla presents no evidence that would undermine Defendant's reasonable reliance on the documented performance and attitude issues as a basis for termination. "Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment." *Mitchell*, 964 F.2d at 585.

Patilla next argues Defendant's failure to use a standard form to discipline him is evidence of pretext. (Doc. No. 18 at 457). But "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 246 (6th Cir. 2005). Before this fact can provide an inference of pretext, Patilla must establish what Defendant's standard disciplinary procedure was or what process he may have been due. *See Lamer v. Metaldyne Co. LLC*, 240 F. App'x 22, 33 (6th Cir. 2007) (finding evidence of pretext where plaintiff terminated under progressive discipline plan but was not afforded the peer review guaranteed under the same plan). Patilla has not shown that Defendant had a standard disciplinary procedure applicable to him and thus, Defendant's alleged failure to follow an unidentified, speculative process cannot create an inference of pretext. *See Sharp v. Profitt*, 674 F. App'x 440, 447 (declining to find evidence of pretext where, "unlike *Lamer*, Sharp cannot point to any guaranteed response to his multiple overt acts of subordination.").

Finally, Patilla argues that if Defendant's characterization of his behavior is true, Defendant's failure to fire him earlier is evidence that the actual motivation behind his termination was retaliatory. (Doc. No. 18 at 455). While a plausible theory, this argument ignores two facts in the record. First, Pascuzzo testified that while his concerns with Patilla arose early in his employment,

18

"I wanted to give him every opportunity for him to become part of the team[.]"  (Doc. No. 17-3 at 154).  And second, Patilla's performance and attitude issues persisted after the protected activity, giving independent bases for further discipline.  *See Curley v. City of North Las Vegas*, 772 F.3d 629, 633-34 (9th Cir. 2014) (defendant's failure to fire employee earlier was not evidence of pretext where there was also evidence of misconduct after protected activity).

Even crediting Patilla's evidence of pretext in a light most favorable to him, I find that he has not met his burden of presenting sufficient evidence from which the jury could reasonably reject Defendant's reasons for firing him.  *See Chen*, 580 F.3d at 400.  As he has failed to establish a genuine issue of fact that his termination was pretext for intentional discrimination or retaliation, his claims must be dismissed.

## V.  CONCLUSION

For the foregoing reasons, I grant Defendant's motion for summary judgment.  (Doc. No. 17).

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge